Plaintiff, the widow of James Franklin Rhodes, deceased, instituted this action against N.H. Wheless Drilling Company, a commercial co-partnership, employer of the deceased, and the American Central Insurance Company, alleged carrier of its compensation insurance, to recover workman's compensation at the rate of $20 per week for three hundred (300) weeks, on the theory that the death of Rhodes was due to the effects of an accident that befell him on March 20, 1944, while performing the duties of a contract of hiring between him and said company. The suit is resisted on two grounds, viz.:
1. That Rhodes did not die from the effects nor as a consequence of the alleged accident; but died of cancer that was not in any way or manner connected with, due to, or aggravated by injury from the accident.
2. That plaintiff was not the lawful wife of the deceased at the time of the accident, a necessary condition precedent to her right to recover compensation as his dependent widow.
Plaintiff's demand was rejected and her suit dismissed. She appealed to this court.
While trial was in progress, by agreement of counsel, The Fidelity and Casualty Company of New York was substituted as defendant in lieu of American Central Insurance Company.
Plaintiff, according to her own testimony, lived in open concubinage with the deceased from April, 1938, until their marriage on July 31, 1944. He died on the 13th day of December, 1944, or four months and thirteen days after the marriage; however, in view of the conclusion reached by us that the first named defense is well sustained by the testimony, we abstain from passing on the second one.
The accident alleged upon occurred near Carthage, Texas, where the employer was engaged in oil well drilling operations. Other than hearsay, no testimony was offered to prove the facts of the accident, but it is not seriously denied that the deceased, as alleged, fell some six feet from a pipe rack of a drilling rig to the ground, striking his right hip violently against a stump. Pain and swelling at the locus of the blow soon set up, but on account of a shortage of men of his crew, deceased, for the ensuing three days, reported for duty, although he worked under considerable difficulty. On the fourth day following the accident he consulted a physician who made an X-ray of his hip. The picture was negative as to bone injury. He returned to work and worked until the next pay day, but on account of persistence of the pain and swelling of the hip, he was forced to permanently cease work. A physician in Carthage *Page 389 
threated the injury for several days without favorable results.
The deceased next consulted Dr. E.T. Hilton, a general practitioner in Shreveport, in May, who continued to treat him professionally until his death seven months later. During this time he complained of pain in his right hip but objective symptoms were lacking. X-rays made by Dr. Hilton revealed no bone pathology. For a month the patient's condition seemingly underwent no change. He was placed in a hospital in the City of Shreveport and new pictures made of the hip on June 19th, disclosed, as stated by Dr. Hilton: "some little erosion on the end of the pelvis bone, and there was evidence of some growth of the soft tissues; just beginning to show in the X-ray." These changes were in the region from whence the pain emanated, and motivated the doctor's action in promptly going into the hip in the hope of determining the cause of the trouble. Some soft tissue was removed for the purpose of diagnosis. To this end the specimen was sent to Dr. Willis P. Butler, coroner of Caddo Parish, who, after appropriate examination, pronounced it cancerous.
After receiving Dr. Butler's report, other doctors then began the quest to determine if this cancerous locus was primary or the result of metastasis. Dr. W.R. Mathews, pathologist, attached to the Shreveport Charity Hospital, after examining the tissue, was of the opinion that the cancer's origin was elsewhere. He leaned to the belief that the primary cancer was in the region of the kidney or adrenal glands. Exact determination of the question was then impossible. The uncertainty could not be removed while the patient was living.
The deceased's condition gradually grew worse. He spent considerable time in the hospital and at date of his death was badly emaciated. The doctors who had studied his case were all of the opinion that the cancerous condition found in the hip did not and could not of itself so quickly work such physical change in a man who theretofore was strong, robust and well able to perform the arduous duties of an oilfield worker.
With plaintiff's consent, Dr. Mathews did a complete autopsy on the body of the deceased, excepting the head. He summarizes his major findings as follows:
"We found that there was a cancer originating in the upper lobe of the left lung that had metastasized and extended to the lymph nodes related to the lung on that side, to both adrenal glands, to the right inguinal and pelvic lymph nodes and to the right hip bone."
Dr. Mathews was positive that the primary cancer of the lung produced death, and that there was no causal connection whatever between the trauma and death. He further testified as follows:
"The cancer originated in the lung, that is, bronchus to the left upper pulmonary lobe and, as they always do, extended to other parts of the body. It is not characteristic only of lung cancer that one suffers extension to remote parts of the body from the primary lesion.
"Now there can be no causal relationship between cancer starting in the lung and a blow to the hip. It seems unlikely that there is any sort of relationship to any phase of this cancer and the blow, insofar as I am able to tell."
* * * * * *
"We know that tumor or cancer, did not start in the hip. I make that statement because it was not the type of tumor that would have arisen from either the bone or the surrounding soft parts because the cancer was of such type of cells as could not have developed in any tissues in that location. That would definitely exclude a blow to the hip as causing the development of cancer there."
* * * * * *
"Q. But an injury to a patient, causing him to be emaciated and in a run-down condition, could have hastened his death from these cells, could it not? A. I think that would not be unreasonable. I think that anything that might have contributed to poor nutrition and anxiety and worry would have been factors. However, I point out again that if he had had no injury, whatever, he would have died from his disease. They live, at the most, but about two years. From the diagnosis made *Page 390 
in this case it would have been less than that; maybe nine months."
Dr. Mathews made a lengthy written report covering all phases of the autopsy. It is in the record. After he had completed the dissection of the body for the purpose of the autopsy he called in Dr. Butler to view the situation. He examined the removed organs and the slides that had been prepared for microscopic study. The tissues were examined under microscope. Dr. Butler gave the following testimony, viz.:
"A. * * * The original tissue examination made approximately some six months before was definitely malignant, but where it came from I could not know. However, in making examination of the gross material, including the lungs and these other organs, and looking at them under the microscope, then anyone with considerable experience in examining gross material and slides could have no doubt as to what the condition was. It was very definite.
"Q. Where was the primary cancer or tumor? A. The primary tumor was fairly large and originated somewhat between and to one side, — I do not remember which now, — in the lungs. It involved rather a considerable area. The crab-like appearance showed that the tumor had started there. Those familiar with examining can tell by the way they grow and spread out, sort of crab-like into the other tissues, that the origin was there; beginning to give off metastasis or starting to make secondary tumors either in the blood or lymph circulation. When you get the whole thing like that you can tell the beginning or original site."
* * * * * *
"A. In this instance I had no doubt in the beginning that we had a malignant condition of the hip. Then I was definitely sure after the complete examination that the point of origin was in the lungs because the malignant condition in the hip had all of the characteristics of those lung cells. Now those are abnormal, diseased cells, but in spite of their being abnormal and diseased they have tendency and desire to reproduce whatever they were originally from. For instance, if you take a tumor of the breast, we will say, it would have certain characteristics as to kind of glands and structure. Then if you find a secondary tumor in the arm or in the chest or somewhere and find the same characteristic cells and glands, that would definitely tell you that the tumor began in the breast."
He, at length, gave logical reasons for the conclusions reflected from the quoted portions of his testimony. It was his definite opinion that the trauma had nothing to do with the man's death. He also said death would have resulted from the cancer regardless of the trama.
The opinion of Dr. Leroy Scott, who has engaged in the practice of medicine and surgery for many years, was in some respects at variance with those of Dr. Mathews, as reflected from his report and testimony, but, after reading the report, Dr. Scott testified, to-wit:
"I think from Dr. Mathew's experience, the autopsy that he made and the report that he gave on it, he was quite logical in his conclusions."
* * * * * *
"I think that is a very splendid report and it seems to me that there is every reason to believe that the tissues (cells) were primarily in the lung and they did metastasize to the hip. That is a conclusion we come to from his report."
When asked:
"Assuming whatever facts stated in his report would you be disposed to challenge any conclusions that he reached?"
He answered:
"No, I have no challenge to make at all."
Appellant principally bases her hope to recover upon the theory that the bruise to the hip bone either caused a cancer there or activated a pre-existing dormant cancerous condition of that locus which caused or materially contributed to and hastened Rhodes' death.
Whether the cancer cells were implanted in the hip prior to the accident, or lodged there thereafter, no one would venture an opinion. The latter would seem most probable because the medical experts all agree *Page 391 
that cancer cells, as well as other disease producing germs, find bruised tissue favorable to their propagation and destructive activity. However, against this theory, in the instant case, it is shown that some of the cancer cells in their course of metastasis lodged in and infected the tissues of organs that had not been bruised to any extent.
We experience no difficulty in concluding that the origin of the cancer was in the lung. The autopsy disclosed definitely that the disease involved a goodly part of that and adjacent organs and even had it not spread to other parts of the body, its ravages would surely have caused death within two years of its incipiency, the time thereof being impossible to determine. It is almost as equally certain that cancer cells were in the lung prior to the accident, and metastasis would have taken place regardless of the trauma.
It is apropos to this discussion to say that Dr. Butler has been coroner of Caddo Parish for many years. To efficiently perform the duties of that important office its occupant must be a profound student of medicine, skilled surgeon and erudite pathologist, buttressed by years of experience. The record in this case and in other cases before this court wherein Dr. Butler testified as expert, abundantly prove that he possesses all of these needed qualifications. As a pathologist he stands out eminently.
What we have said concerning Dr. Butler's experience, skill and ability as a pathologist and otherwise, equally applies to Dr. Mathews. He now holds and has held for many years the responsible position of pathologist in the Shreveport Charity Hospital. The report made by him of the autopsy in this case reflects scientific accuracy and profound knowledge.
In view of the established ability and proven experience of Drs. Butler and Mathews, we are amply warranted in accepting their expert opinions in the respects herein mentioned, and in predicating thereon our own opinion as regards cause of death. General practitioners, however honest, who testified in the case are not as competent to deal with the discussed subject matter as is one who has spent many, many years specializing therein.
For the reasons herein assigned, the judgment appealed from is affirmed, at plaintiff's cost.